IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| SANDRA A. MOEN, | ) | Civil No. 04-6096-JE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Kathryn Tassinari
Drew L. Johnson
1700 Valley River Drive, First Floor
Eugene, OR 97401
    Attorneys for Plaintiff

Karin J. Immergut
Craig J. Casey
U.S. Attorneys Office
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

David M. Blume
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075
    Attorneys for Defendants

FINDINGS & RECOMMENDATION - 1

JELDERKS, Magistrate Judge:

Plaintiff Sandra Moen brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits under 42 U.S.C. § 416. The Commissioner's decision should be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed her first application for disability insurance benefits on February 10, 1998. In that application, plaintiff alleged that she had been disabled since June 20, 1997, because of ulcerative colitis. The application was denied initially on February 26, 1998, and on reconsideration on March 27, 1998. The denial became final when plaintiff did not seek further review of the decision.

Plaintiff filed a second application for disability insurance benefits on September 19, 2001. In that application, plaintiff alleged that she had been disabled since July 1, 1997, because of ulcerative colitis or Crohn's disease. Plaintiff later amended her alleged onset of disability date to February 1, 2000.

Plaintiff's second application was denied initially on November 19, 2001, and upon reconsideration on May 9, 2002.

Pursuant to plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) Jean Kingrey on

September 4, 2003.  Plaintiff and C. Kay Hartgrave, a Vocational Expert (VE), testified at the hearing.

In a decision filed on October 24, 2003, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act.  That decision became the final decision of the Commissioner on January 16, 2004, when the Appeals Council denied plaintiff's request for review.  Plaintiff seeks review of that decision in the present action.

## FACTUAL BACKGROUND

Plaintiff was born on December 15, 1961, and was 41 years old at the time of the hearing.  She graduated from high school, and attended college for two years.  Plaintiff has past work experience as an escrow manager and executive secretary.  At the time of the hearing in September 2003, plaintiff was teaching yoga classes approximately three hours per week.

## MEDICAL RECORD

Plaintiff was diagnosed with distal colitis in January 1997.  At that time, she was symptomatic, with frequent stools which contained blood and mucous.  Plaintiff was treated conservatively, and her symptoms improved, but did not totally resolve.  Plaintiff was working as an escrow officer at the time, and said that she wanted to change careers.  Though she continued to work as an escrow officer for a time, she told

her treating physician, Dr. Daniel Phillips, that the stress of her job exacerbated her symptoms.  Dr. Phillips encouraged her to find other work.

After taking some medical leave on an employment disability plan, plaintiff stopped working in February 1998. She then filed a Workers Compensation claim asserting that work-related stress was a major contributing cause of her ulcerative colitis.  Treating records indicate that plaintiff was doing fairly well in early 1998, and her condition was described as "persistent mild colitis" at that time.  In May, 1998, Dr. Phillips noted that plaintiff had "ulcerative proctitis/left-sided ulcerative colitis under good control with simple Rowasa suppositories currently, but . . .has remarkable relapse of symptoms and histologically significant disease when she returns to work."  Dr. Phillips stated that he agreed with plaintiff "that it is not at all reasonable to expect her to go back to the previous employment she had," and added that he told plaintiff he "would support her on a disability claim . . . ."

Dr. Charles Bellville, a psychiatrist, examined plaintiff on August 28, 1998.  Dr. Bellville opined that there was "no psychological reason why [plaintiff] could not work, but stresses inherent in her escrow work "for whatever reason caused her ulcerative colitis to flare-up and for that reason

alone she would do best to avoid that type of work in the future."

Dr. Larry Heinonen, a gastroenterologist, also examined plaintiff on August 28, 1998. Dr. Heinonen noted that plaintiff reported being off almost all medication for the previous six months, and opined that there was no causal relationship between stress and ulcerative colitis. He stated that, "[w]hile emotional stress may increase the symptomology or cause a flare of the disease, the underlying cause or etiology of the ulcerative colitis is not related to stress itself." Dr. Heinonen opined that plaintiff's work was not the major cause of her ulcerative colitis, and stated that plaintiff was medically stationary and could return to work. Dr. Heinonen also stated that plaintiff should "see her physician" and seek treatment "to prevent a recurrence of the disease." In an addendum to his report dated September 14, 1998, Dr. Heinonen added that, although plaintiff's disease was under good control, it was possible that she could experience future problems, despite appropriate therapy, because the disease is known to produce repeated flares. He reiterated that plaintiff's disease appeared "to be under good control."

Plaintiff was seen by her primary care physician, James Self, M.D., in September 1999 for a routine examination. Dr. Self noted that plaintiff had experienced a "severe bout

[of colitis] in April and May" of that year, but had otherwise had "no interval major problems" since she saw Dr. Phillips in 1998. He also noted that plaintiff was using non-traditional medical treatment, and was "basically doing well," though she experienced "occasional loose stool and food intolerance." Dr. Self described plaintiff's colitis as "in remission."

Plaintiff was seen by John Gambee, M.D., in July 2000. Plaintiff reported that her colitis had been in remission for three years beginning in 1997, and that "in June 2000 she again developed urgency, frequency, loose stools, blood and mucous," and did not want more medication. Dr. Gambee indicated that plaintiff was "doing well" when she returned for another visit on August 2, 2000.

When she was examined by David Morrell, M.D., on October 25, 2001, plaintiff reported that she had been "in remission for a period of 1-1/2 years starting in May of 1998," after which she "redeveloped her symptoms in 1999." At the time of the examination, plaintiff reported that she experienced "continual cramping and occasional nausea and vomiting," and that she had "continuous symptoms" of blood and mucous in her stools, and had bowel movements from four times a day to almost constantly throughout the day. Dr. Morrell diagnosed inflammatory bowel disease, reported that plaintiff was "rather skinny" which could reflect "an element of malnutrition," and noted that plaintiff had a normal

neurological examination.  Dr. Morrell stated that plaintiff's
subjective complaints were "congruent with the objective
findings," and opined that "[c]orrelation with the claimant's
medical record is extremely important in this case. . . ."

Plaintiff was seen by Dr. Randall Lewis, one of her
treating physicians, for a gynecological exam on December 19,
2001.  Dr. Lewis stated that plaintiff had been diagnosed with
ulcerative colitis since he had last seen her in 1999.
Plaintiff reported that she had experienced a severe bout of
colitis in April and May of 2001.  Dr. Lewis noted that
plaintiff worked as a yoga instructor, exercised regularly,
and weighted 136 pounds.

Plaintiff also returned to see Dr. Phillips, her treating
gastroenterologist, the same day.  Dr. Phillips noted that he
had not seen plaintiff since 1999.  He reported that plaintiff
had experienced a flare-up of symptoms in 1999 when she
experienced "severe stress" related to problems with her
daughter.  Dr. Phillips indicated that plaintiff reported
that another flare-up had occurred in May 2001 during which
she experienced abdominal distention, passed blood and mucous,
and had no bowel movements.  Plaintiff stated that her
symptoms improved after a week, after which she began using
"Gastrex," a herbal remedy, and that her symptoms went into
"complete remission after several months."  She had gone on
and off Gastrex, and concluded that it improved her condition.

Dr. Phillips stated that plaintiff "is now doing relatively well," and noted her weight was the same as it had been in 1997. He also noted that plaintiff "made a settlement with regard to her long-term disability and dropped her social security disability application but now is running out of funds and with continuing symptoms and difficulty with working on a full time basis and because of the possibility of recurrent symptoms, is reconsidering the notion of applying for disability." Dr. Phillips diagnosed a history of left-sided ulcerative colitis with "[s]ymptoms now under control with an herbal remedy called Gastrex." He indicated that plaintiff was to return for a followup in six months, or sooner if she experienced a flare-up.

Approximately one year later, on December 3, 2002, plaintiff returned for a followup with Dr. Phillips. Plaintiff reported that her ulcerative colitis had been "under control with an herbal remedy called Gastrex," and indicated that she did not wish to pursue any other therapy. She also reported that she had tried two new supplements, which had caused a flare-up of her symptoms, that she had negligible blood in her stools, and that she experienced an exacerbation of diarrhea around the time of her menstrual cycle. Plaintiff's weight was stable, and she denied "any abdominal pain, nausea, or vomiting." The chart note states that plaintiff indicated that she had been unable to

successfully hold down a full-time position because she experienced a flare-up of symptoms when she returned to work. The note adds that "it appears that since she has not been employed she has had reasonably good control of her disease." Dr. Phillips told plaintiff that most patients with ulcerative colitis required long-term maintenance therapy to prevent relapses, and that he "believes that individuals who have ulcerative colitis should be able to be gainfully employed, provided that their disease is under good control."

In a telephone call to Dr. Phillip's office on January 17, 2003, plaintiff asked about a "bowel rest" and the possibility of obtaining nutrition through a home infusion. Plaintiff asserted that she had experienced no remission since 2000, said that "nothing works," and said she had had blood in her stools for the previous two years. Dr. Phillips told a nurse to inform plaintiff that "bowel rest" was "not something we do." The note of the call also states that "[a]ctually her symptoms are no worse than they have been over the past 2 years."

Chart notes from plaintiff's visit to Dr. Phillips dated January 29, 2003, state that plaintiff reported feeling "the best she has felt in some time." Plaintiff continued to use "Gastrex," which she thought gave her the most relief, and did not wish to pursue any other treatment. The note reported that plaintiff's menstrual cycle "appears to exacerbate her

symptoms, and she may have slightly more blood and increase in stools, up to 5 to 6 q.d." Dr. Phillips instructed plaintiff to follow up with Dr. Lewis concerning the possibility of taking Depo injections, which would cease menstruation. In a chart record dated January 30, 2003, Dr. Phillips noted that plaintiff's last colonoscopy had been performed in 1997, and had showed "disease pretty much below 20 cm." He added that one biopsy of the ascending colon "suggested colitis so it is possible she has a form of mild panulcerative colitis." He also stated that a sigmoidoscopy he had performed in March 1997 "suggested everything was normal proximal to 10 cm. So it is not altogether clear whether she had panulcerative colitis or ulcerative proctitis." Dr. Phillips opined that plaintiff would not need another screening colonoscopy until 2005 "even if we considered it panulcerative colitis . . . ."

Plaintiff underwent a series of acupuncture treatments from February to July 2003. In interim history reports she filled out during the course of those treatments, plaintiff noted improvement in her condition.

Dr. Phillips wrote several letters concerning plaintiff's condition. Some of the letters were written before February 1, 2000, the amended date of the alleged onset of disability to which plaintiff testified at the hearing before the ALJ. In a letter dated April 14, 1998, Dr. Phillips stated that plaintiff "is doing well" when she is not working,

and that "when she is working, she is incapable of continuing
to work."  In a letter dated June 9, 1998, Dr. Phillips stated
that plaintiff's ulcerative colitis was "totally disabling"
when "active," and that "her symptoms are much worse at work
than they are when she is not working in her previous capacity
as the Springfield Branch Manager for Western Pioneer Title."
He added that he could not explain "this correlation."  In a
letter dated September 15, 1998, Dr. Phillips stated that he
did not believe plaintiff "should resume employment with her
previous employer," but did "not think that precludes her
being able to work in the banking industry or other working
environment."  In a letter dated February 2, 1999,
Dr. Phillips opined that plaintiff's duties as an escrow
officer were "probably contributing to [plaintiff's]
disability," and that "it would be inadvisable for her to
return to that specific position."  He added that this did not
"necessarily preclude her working in a position of lesser
authority or responsibility."

In letters written after the amended alleged onset date
of plaintiff's disability, Dr. Phillips reiterated that there
is a correlation between plaintiff's symptoms and her work as
an escrow officer.  In a letter dated December 20, 2002, he
stated that

> To answer your question simply whether Ms. Moen
> could work an 8-hour day with a normal break
> period, five days per week on a sustained basis
> without missing more than 2 days per month from

work - I believe in some jobs that she could do
this. Her disability seems to be related to certain
specific types of stressful environments. Should
she find a working situation that does not involve
that type of stressful environment, I believe she
could work full time."

In a letter dated June 27, 2003, Dr. Phillips stated that

plaintiff had recently asked him "to make a statement

regarding her ability to work more than half-time."

Dr. Phillips noted that there seemed to be a correlation

between plaintiff's symptoms and her full-time work "in the

mortgage and title industry." He stated that he did "not

typically consider her disease to be related to a specific

occupation," but had observed that plaintiff experienced

symptoms when she returned to full time work "in that

industry. . . ." Dr. Phillips added that plaintiff "was doing

well" when she was last seen in his office on January 29,

2003.

### HEARING TESTIMONY

At the hearing before the ALJ, plaintiff testified that

she had a flare-up of colitis in August 2003, that she had

had a bad fare-up in April 2001, and that she experienced

"ongoing" flare-ups, though she was not seeing a doctor.

Plaintiff testified that she continued to take Gastrex, and

that her daily activities included house cleaning and grocery

shopping. Plaintiff testified that she had been symptom-free

only from March 1998 to January 2000, and from March 2003 to

August 2003. Plaintiff testified that her symptoms worsen

around the time of her menstruation, and that she stays home for about two weeks during that time, during which her children care for themselves. She also testified that she has as many as six bowel movements a day at other times of the month, that she has "accidents" about once a month, that she has about two "bad days" a month, and that her symptoms are more severe under stress. She added that she spent half the time in the bathroom during two days a month, a quarter of the time in the bathroom during four or five days a month, and that her frequent need to use the bathroom would cause her to miss work up to half the time if she returned to work. Plaintiff testified that she avoided going to a doctor because she could not afford it, and because the various medications that had been prescribed did not provide much relief.

The ALJ posed a hypothetical for the VE describing an individual of plaintiff's age, with a high school education and plaintiff's past work experience. The ALJ limited the described individual to "light work, and in addition she would need to have bathroom access. And she should have no executive positions such as last work as the escrow officer, or office manager."

The VE testified that a person with the residual functional capacity described could work as an office clerk, a teacher's aide, or a mail room clerk.

On cross-examination by plaintiff's attorney, the VE testified that an individual who had to spend 25% of the time in the restroom four days a month would need special consideration from an employer, and would face at least a 75% reduction in potential employers.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

<u>Step One</u>. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

<u>Step Two</u>. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the

Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. <u>Tackett</u>, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. <u>Id.</u>

## ALJ'S DECISION

At the first step of disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the date of the alleged onset of disability.

At the second step, the ALJ found that plaintiff's ulcerative colitis was a severe impairment.

At the third step, the ALJ found that plaintiff's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1.

At the fourth step, the ALJ found that plaintiff could not perform her past relevant work. He found that she retained the functional capacity to perform light work "but

needs bathroom access," and that she was "unable to perform executive positions."

At the fifth step, the ALJ found that plaintiff could perform other jobs that existed in significant numbers in the national economy, including work as an office clerk, a clerical teacher's aide, and a mailroom clerk. Accordingly, the ALJ concluded that plaintiff was not disabled within the meaning of the Social Security Act.

In finding that plaintiff was not disabled, the ALJ found that plaintiff's allegations concerning her limitations were not fully credible. In support of this finding, the ALJ cited differences between plaintiff's statements concerning her symptoms and evidence in the medical record, plaintiff's failure to seek significant medical attention even though she had medical insurance, and plaintiff's statements to her physician indicating that she was considering applying for disability because of the possibility that her symptoms might recur.

## DISCUSSION

Plaintiff contends that the ALJ erred in rejecting her testimony, in failing to fully credit the opinion of her treating physician, and in failing to establish that she actually retains the functional capacity to perform work that exists in the national economy.

1. <u>Credibility determination</u>

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is not unsupported by objective medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) <u>citing</u> <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 343 (9th Cir. 1990)(<i>en banc</i>). Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. <u>Id.</u>, <u>quoting</u> <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the

individual's functional limitations and restrictions due to pain or other symptoms."

Plaintiff produced evidence that her ulcerative colitis could reasonably be expected to produce some symptoms. References in the record to plaintiff's exhaustion of the proceeds of a previous settlement and to plaintiff's consideration of seeking social security disability benefits because of "the possibility of recurrent symptoms" at a time when she was asymptomatic suggest the possibility of malingering. However, for the purposes of evaluating the ALJ's credibility determination, I will assume that there is no record of malingering. Accordingly, the ALJ needed to provide clear and convincing reasons for determining that plaintiff was not wholly credible.

The ALJ met that burden by citing substantial medical evidence that was inconsistent with the frequency and severity of symptoms and impairments to which plaintiff testified, and by citing inconsistencies in plaintiff's statements concerning her symptoms. The ALJ cited substantial objective medical evidence which contradicted plaintiff's testimony. The ALJ noted that plaintiff's condition was generally described as "mild" and "in remission" in the medical records until at least June 2000, when plaintiff experienced a flare-up. She noted that when plaintiff was sent for a consultative examination in October 2001, she described her symptoms as

much more severe than they are consistently described in the records of her treating physicians.  The ALJ correctly noted that Dr. Phillips' record of a visit in December 2001 indicates that plaintiff had experienced only one flare-up, in May 2001, which responded after one week, and that plaintiff was "asymptomatic" on Gastrex at the time of the visit.  The ALJ noted that the record as a whole established that plaintiff's flare-ups were infrequent, and that her symptoms were "fairly consistently controlled with dietary controls in conjunction with herbal remedies."  She noted that plaintiff's description of her symptoms as "essentially being totally debilitating for two weeks out of each month" is not supported by the record.  She also observed that, given that plaintiff had medical insurance coverage, her decision not to pursue "even a moderate amount of medical attention" was inconsistent with the severity of symptoms to which she had testified.  In addition, the ALJ noted that the references in the medical records to plaintiff's symptoms as being essentially in remission were based upon plaintiff's "own reports when she did see the doctor; her medical insurance deductible, high or low, does not change that."  She also noted that plaintiff's weight gain during the previous five years was inconsistent with the degree of symptoms during that period to which plaintiff testified.

An ALJ may consider objective medical evidence as a
factor in evaluating a claimant's credibility.  Thomas v.
Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); SSR 96-7p.  An
ALJ may consider inconsistencies in a claimant's statements in
evaluating credibility.  Id. at 959; SSR 96-7p.  Infrequent or
minimal, conservative medical treatment likewise may support
the conclusion that a claimant's testimony is not wholly
credible.  See Fair v. Bowen, 885 F.2d 597, 603-04 (9th Cir.
1989).  Here, the ALJ considered objective medical evidence
that was inconsistent with plaintiff's testimony, contrasted
the relatively mild symptoms plaintiff described to her
physicians and the extreme symptoms to which she testified at
the hearing, and noted the infrequency of plaintiff's efforts
to seek medical treatment.  These reasons are sufficient to
support the ALJ's determination that plaintiff's testimony was
not wholly credible.


2. Evaluation of Dr. Phillips' opinion

Because they have a greater opportunity to know and
observe their patients, treating physicians' opinions are
given greater weight than the opinions of other physicians.
Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989).
Accordingly, an ALJ must support the rejection of a treating
physician's opinion with "findings setting forth specific and
legitimate reasons for doing so that are based on substantial

evidence in the record." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). Rejection of a treating physician's uncontroverted opinion must be supported by clear and convincing reasons. <u>Lester v. Chater</u>, 81 F.3d 821, 830-31 (9th Cir. 1995).

Plaintiff contends that the ALJ improperly rejected Dr. Phillips' opinion that "it would be inadvisable for Moen to return to her position as an escrow officer," and his opinion that when plaintiff's ulcerative colitis is active, it is "totally disabling, interfering with concentration and requires her to make multiple trips to the bathroom." Plaintiff asserts that Dr. Phillips' opinion supports her own testimony about the disabling nature of her disease, and requires a finding of disability because the VE testified that there is "low tolerance" in the workplace for an individual who has to spend up to 25% of the time in the bathroom.

The ALJ in fact accepted a number of Dr. Phillips' various opinions concerning plaintiff's condition and the effect on her ability to work. During the period after the alleged onset date of plaintiff's disability, Dr. Phillips opined that people who have ulcerative colitis can be gainfully employed if their disease is under control. The ALJ accepted that opinion, and concluded that plaintiff's disease was under control--a conclusion that was supported by substantial evidence in the medical record. Dr. Phillips

opined that plaintiff could not return to her previous occupation as an escrow agent because that work was too stressful. The ALJ concurred: Her hypothetical to the VE precluded work in "executive positions such as last work as the escrow officer, or office manager," and the positions that she found plaintiff could perform did not involve the kind of work that Dr. Phillips had identified as inappropriate. Dr. Phillips opined that there were some positions in which plaintiff could work full-time without excessive absences. Again, the ALJ agreed.

The opinions of Dr. Phillips upon which plaintiff seeks to rely here were given before the alleged date of the onset of plaintiff's disability. During the period of alleged disability at issue here, Dr. Phillips opined that plaintiff should not work in her former occupation as an escrow agent because it was too stressful, but that she could perform other, less stressful work. The ALJ did not reject these relevant opinions.

3. <u>ALJ's conclusion that plaintiff could perform "other work" in the national economy</u>

Plaintiff contends that, after correctly concluding that she could not perform her past relevant work, the ALJ erred at step five of the disability analysis by determining that plaintiff could perform "other work" in the national economy.

She argues that the ALJ improperly ignored the VE's testimony that an individual who needed to spend 25% of the time in the restroom during four days a month would face a reduced labor market, and that an individual who needed to spend 50% of her time in the restroom on two additional days per month would face a further eroded occupational base.

In determining that plaintiff could work as an office clerk, a clerical teacher's aide, or a mail room clerk, the ALJ did not reject the VE's testimony. Instead, the ALJ did not accept the contention that plaintiff was as severely limited as plaintiff's attorney assumed in his cross examination of the VE. As noted above, the ALJ properly rejected plaintiff's testimony concerning the severity of her symptoms and limitations. Her hypothetical, which included a restriction to light work, required access to a bathroom, and ruled out work in executive and management positions, accurately described the limitations established by the record. The ALJ did not err in rejecting the characterization of plaintiff's limitations set out in the attorney's cross examination of the VE, and satisfied her burden of establishing that plaintiff could perform "other work."

## CONCLUSION

For the reasons set out above, the Commissioner's decision denying plaintiff's request for disability benefits

should be AFFIRMED, and a judgment should be entered dismissing this action with prejudice.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due March 25, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 9th day of March, 2005.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge